IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:18-CR-00194-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW |
| SARAH JANE BRINSON | |
| Defendant. | |

The Defendant Sarah Jane Brinson, by and through the undersigned counsel and pursuant to Fed. R. Crim. P. 12(b)(1) and 12(b)(3)(B)(v), hereby moves to dismiss Counts One, Two, Three, and Four of the Indictment for failure to state an offense. Counts One and Two charge violations of 18 U.S.C. § 1546(a) and 2. Counts Three and Four charge violations of 18 U.S.C. § 1015(a) and 2.

## INTRODUCTION

Ms. Brinson, an immigration lawyer, represented a client, Eliseo Hernandez-Lorenzo ("Hernandez"), who was brought to the United States as a child and eligible for the now-defunct Deferred Action for Childhood Arrivals ("DACA") program. Brinson prepared a Form I-821D DACA Consideration Form and a parallel I-765 Application for Employment Authorization Document ("EAD") on behalf of Mr. Hernandez. The DACA and EAD forms left blanks in the space available for applicants to list "Other names used (*including maiden name*)" and "Other names used (*include Maiden Name*)," respectively. The indictment alleges that Ms. Brinson was aware that Mr. Hernandez had used an alias to work in the United States and had represented him in traffic court under his alias. For four main reasons, the facts

1

alleged in the indictment, "even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004).

First, Ms. Brinson cannot be convicted of aiding and abetting her client's allegedly "false statement" in failing to list aliases under the "Other Names Used (*include Maiden Name*)" prompts because neither the forms themselves, nor their underlying instructions, notified applicants that they were expected to disclose aliases in the space provided. This facial ambiguity was compounded by the fact that the U.S. Citizenship and Immigration Services ("USCIS") issued 2012 DACA guidance instructing applicants *not to include* certain information in forms concerning their prior use of false identities. Based on the USCIS Guidance, well-known organizations like the Catholic Legal Immigration Network published resource guides noting that "[n]either the I-821D nor the I-765 asks whether the applicant used a false document when applying for employment." This USCIS guidance was further adopted by legal treatises. *See e.g.* 1 Immigration Law Practice Expediter § 20.00, LexisNexus. Legal practitioners across the country fairly concluded that USCIS's instruction not to list false social security numbers in response to a request for "all numbers you have ever used" meant the similarly worded "other names used" also did not require disclosure of false names. Furthermore, unlike the forms at issue in this case, other USCIS forms directly request "aliases" when applicants are required to provide them. Considering the facial ambiguity of the forms and the fact that Government guidance at the time did not require disclosure of aliases, all four counts of the indictment must be dismissed.

Second, Ms. Brinson cannot be convicted of Counts One and Two because the DACA and EAD applications are not "required by the immigration laws" under Section 1546(a).

DACA arose not from any immigration statute, regulation, or rulemaking, but from an Obama Administration policy memo concerning its exercise of prosecutorial discretion. DACA conveyed no substantive right, immigration status, or pathway to citizenship. DACA and EAD participation are not "required by the immigration laws or regulations" and, therefore, they cannot form the basis of a § 1546(a) violation.

Third, Ms. Brinson cannot be convicted of aiding and abetting her client in making a "false statement" under Counts Three and Four because Section 1015(a) relates only to statements under oath "in a *case, proceeding, or matter… relating to naturalization, citizenship, or registry of aliens*[.]" As a matter of law, DACA and EAD forms do not relate to "naturalization, citizenship, and registry of aliens," all of which are defined terms of art in immigration law. Furthermore, there was never a "case, proceeding, or matter" at issue in this case.

Fourth, Counts One and Two must be dismissed because Hernandez's disclosure or non-disclosure of his use of aliases to work in the United States in response to the "Other Names Used (*include Maiden Name*)" prompts is immaterial to his DACA eligibility to as a matter of law. DACA only requires that applicants "[h]ave not been *convicted* of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety."[1] An applicant's prior (unconvicted) use of an alias is immaterial to his eligibility for DACA.

---

[1] *See* **Exhibit 1**, Memorandum from Department of Homeland Security Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children (June 15, 2012) (available at: https://www.dhs.gov/sites/default/files/publications/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf) (the "2012 DACA Memo") (emphasis added).

<u>**STATEMENT OF LEGAL FRAMEWORK**</u>
<u>**AND FACTUAL BACKGROUND**</u>

1. <u>The now-defunct DACA Policy was an exercise of prosecutorial discretion, not the product of immigration statutes, regulations, or executive order.</u>

On June 15, 2012, Secretary Napolitano formally announced the Obama Administration's DACA policy in a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." *See* **Exhibit 1**, 2012 DACA Memo.

The policy goal was to defer the deportation of "certain young people who were brought to this country as children and know only this country as home." *Id.* Individuals would be "considered for an exercise of prosecutorial discretion pursuant to [the] memorandum" if they came to the United States under the age of sixteen, were enrolled in or graduated from high school, and "[had] not been convicted of a felony offense, a significant misdemeanor offense, or otherwise pose a threat to national security or public safety." *Id.* The administration instructed USCIS to establish a process consistent with the 2012 DACA Memo "for exercising prosecutorial discretion… in order to prevent low priority individuals" from being deported. *Id.*

The 2012 DACA Memo stated that "[p]rosecutorial discretion, which is used in so many other areas, is especially justified here" because "many of these young people have already contributed to our country in significant ways." *Id.* President Obama stated that so-called Dreamers had "studied hard, worked hard, maybe even graduated at the top of [their] class" and that "it makes no sense to expel talented young people… who want to staff our labs, or start new businesses, or defend our country simply because of the actions of their

parents – or because of the inaction of politicians."[2]  President Obama described his DACA policy as a step to "lift the shadow of deportation from these young people" by allowing "eligible individuals who do not present a risk to national security or public safety" to "request temporary relief" and "apply for work authorization."

2.  The DACA Policy conferred "no substantive right, immigration status or pathway to citizenship."

The DACA policy is not an immigration program and does not bestow legal immigration status.  DHS has confirmed that DACA "confer[red] no substantive right, immigration status or pathway to citizenship" and acknowledged that "[o]nly the Congress, acting through its legislative authority, can confer these rights."[3]  President Obama stated "this is not amnesty, this is not immunity… [t]his is not a path to citizenship. . . . This is a temporary stopgap measure that lets us focus our resources wisely while giving a degree of relief and hope to talented, driven, patriotic young people."[4]  The DACA process does not alter an immigrant's underlying immigration status and confers no legal status that a person did not have before.  Employment authorization similarly confers no legalized status on undocumented persons.  *See e.g. Gondal v. U.S. Dep't of Homeland Sec.*, 343 F. Supp. 3d 83, 92-93 (E.D.N.Y. 2018) (adopting the government's position that the "decision to grant deferred action and work authorization is discretionary" and does not create any substantive rights).

---

[2] *See* **Exhibit 2**, President Barack Obama, Remarks by the President on Immigration (Jun. 15, 2012) (available at: https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration).
[3] *See* Exhibit 1, 2012 DACA Memo.
[4] *See also* Letter from Janet Napolitano, Sec'y of Homeland Sec., to Richard Durbin, Assistant Senate Majority Leader 1 (Aug. 18, 2011) ("…it makes no sense to expend our enforcement resources on low-priority cases… DHS enforcement resources must continue to be focused on our highest priorities. Doing otherwise hinders our public safety mission… diverting DHS resources away from individuals who pose a threat to public safety.") (available at http://durbin.senate.gov/public/index.cfm/files/serve?File_id=1180a746-c6d4-4fe9-b11f-cf9be50b6226).

3. The DACA Consideration Form and EAD Application

Consistent with DACA's goal of inviting undocumented persons "to come out of the shadows" for deferred action, neither the DACA Consideration Form nor the EAD Application asked applicants to disclose their prior use of false identities to work in the United States, nor requested the disclosure of aliases or false social security numbers. *See* Written Testimony of USCIS Director León Rodríguez to Senate Committee on the Judiciary (Jul. 21, 2015) ("Hundreds of thousands of DACA recipients are now able to come out of the shadows, attend school without fear, work to support themselves and their families, and contribute to their communities."); *see also State v. Martinez*, 896 N.W.2d 737, 757 (Iowa, 2017) (dismissing identity theft charges against DACA recipient, noting federal authorities may "blanch at prosecuting a person who in good faith responded to their invitation to come out of the shadows for deferred action.").

Consistent with this goal, USCIS issued guidance specifically instructing DACA applicants not to disclose certain information related their use of false identities in the DACA process. The Form I-765 EAD Application instructed applicants to "Include *all* [social security] numbers *you have ever used*." In response to frequent questions from the public, USCIS issued guidance specifically for DACA applicants, advising that "when you are filing a Form I-765 as part of a DACA request," applicants should only "list those Social Security numbers that were *officially issued to you* by the Social Security Administration" in response to the request for "all numbers you have ever used." *See* **Exhibit 3**, USCIS DACA Frequently Asked Questions (Sep. 14, 2012) (available at: https://www.uscis.gov/archive/frequently-asked-questions) (emphasis added).

### a. The I-821D DACA Consideration Form

The DACA Consideration Form in effect at the time of the charged conduct (which has now been superseded) provided space, under "Part 1. Information About You" for applicants to provide certain biographical information, such as "Date of Birth," "Education Information," and "Social Security Number *(if any)*." *See* **Exhibit 4**, DACA Consideration Form I-821D and Instructions, OMB No. 1615-0124, (Ver. 6/25/2013). The form also allowed space to list "Other Names Used (*including maiden name*)" and included fields where applicants could list another Family Name, Given Name, or Middle Name. (*Id* at Question 12).

### b. The I-765 EAD Application

The DACA policy allowed individuals who receive deferred action to apply for employment authorization. The one-page EAD Application at the time of the charged conduct (which has also now been superseded), allowed space for applicants to provide biographical information. *See* **Exhibit 5**, EAD Application Form I-765 and Instructions, OMB No. 1615-0040, Ver. (4/1/2013). Unlike the DACA Consideration Form, the EAD Application called for "Social Security Number (*Include all numbers you have ever used, if any*)." The EAD form also allowed space for applicants to provide "Other Names Used (*include Maiden Name*)." *Id* at Question 2.

### 4. Factual Background

On September 19, 2012, Eliseo Hernandez-Lorenzo ("Hernandez") entered Ms. Brinson's law office and retained her "to prepare a DACA application" on his behalf "in exchange for $500 plus $465 filing fee." (*See* Indictment at ¶ 8). Sixteen months later, on

January 18, 2014, Brinson's office allegedly prepared a Form I-821D DACA Consideration Form and a parallel I-765 EAD Application on behalf of Mr. Hernandez. *Id* at ¶ 22; *see* **Exhibit 6**, Hernandez's DACA Consideration Form; **Exhibit 7**, Hernandez's EAD Application.

Mr. Hernandez's DACA and EAD forms both left blanks in space provided for applicants to list "Other Names Used (*including maiden name*)" and "Other Names Used (*include Maiden Name*), respectively. The indictment alleges that Ms. Brinson knew that Hernandez had used an alias as a "means of identification in order to work in the United States." Indictment at ¶ 8. "Hernandez certified under penalty of perjury that the information contained in the applications was true and correct." Indictment at ¶ 22. Ms. Brinson executed a "preparer's declaration." *Id.* These facts, as alleged by the Government, are assumed to be true only for purposes of this motion.

## ARGUMENT

I. **All Four Counts Should be Dismissed Because Sections 1546(a) and 1015(a), as Applied to the Fundamentally Ambiguous "*Other Names Used (include Maiden Name)*" and "*Other Names Used (including maiden name)*" Fields in the DACA and EAD Forms, are Unconstitutionally Vague and Do Not Provide Sufficient Notice that they Criminalize the Failure to Disclose Aliases.**

To be consistent with due process, a criminal statute must provide "a fair warning ... to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). Accordingly, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier,* 520 U.S. 259, 266 (1997). It

is settled in the Fourth Circuit that "where the law is vague or highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985) (*citing United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974) (overturning conviction where "even if she had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required.")). Whether a criminal statute is vague as applied to the alleged conduct is "decided by the court as an issue of law." *United States v. Mallas*, 762 F.2d 361, 363-64 & n.4 (4th Cir. 1985); *see also United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir.1974); *United States v. Hack*, CR 08-00344DDP, 2009 WL 577762, at *5 (C.D. Cal. Mar. 4, 2009) (considering, on motion to dismiss, whether questions on passport forms were sufficiently vague to render false statement charges an unconstitutionally vague application of the statue).

In the context of criminal statutes, "fair warning" consistent with the Due Process Clause contains three related components. First, the doctrine of vagueness prohibits the enforcement of statutes that proscribe conduct "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Lanier*, 520 U.S. at 266 (*quoting Connolly v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Second, "the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id; United States v. Dedrick*, 665 F. Supp. 2d 535, 538 (W.D.N.C. 2009) (any "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). Third, "although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither

the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. (citations omitted). These related aspects of the fair warning required by due process require a finding that, as applied in this case, the charges under Sections 1546(a) and 1015(a) are unconstitutionally vague.

Sections 1546(a) and 1015(a) are unconstitutionally vague as applied to DACA and EAD applicants and their counsel for failures to list aliases in space allocated for "Other Names Used (*include Maiden Name*)" or "Other Names Used (*including maiden name*)" in the now-expired 2013 versions of the DACA and EAD applications. Prosecuting the failure to list aliases in response to these prompts is an unconstitutionally vague application because: (a) the forms themselves provide no guidance suggesting they require disclosure beyond legally given names [*see* Subsection A, below], and (b) USCIS guidance suggested applicants were *not* expected to submit information concerning false identities [*see* Subsection B, below]. The questions at issue in this matter were necessarily "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Lanier*, 520 U.S. at 266.

"The answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement." *U.S. v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012). Application questions are fundamentally ambiguous where men of ordinary intellect could reasonably disagree as to their meaning. *Id*; *United States v. Good*, 326 F.3d 589 (4th Cir. 2003) (dismissing indictment where defendant failed to disclose prior embezzlement conviction in response to form requiring disclosure of "Theft… Possession or Distribution of Stolen Property… Dishonesty, Fraud, or Misrepresentation…" because the form did not specifically ask about "embezzlement."); *U.S. v. Ryan*, 828 F.2d 1010, 1017 (3d Cir. 1987) ("[T]he jury should not

have been allowed to consider" a response to an excessively vague bank application question, "PREVIOUS ADDRESS (last 5 years)," and "the answer to such question may not, as a matter of law, form the basis of a… false statements prosecution."), *abrogated on other grounds by U.S. v. Wells*, 519 U.S. 482 (1997); *U.S. v. Watts*, 72 F. Supp. 2d 106, 111 (E.D.N.Y. 1999) (a charge alleging that borrowers misrepresented on a loan application that they intended to make further home improvements after their loan closed "should not have been presented to the jury" where the form was ambiguous); *United States v. Manapat*, 928 F.2d 1097, 1101 (11th Cir. 1991) (responses to questions regarding prior convictions on a check-the-box FAA form could not form the basis of a false statements charge where the layout of the form was "misleading and confusing" and "the way it is configured in the form amounts to a trick question[.]"); *United States v. Lattimore*, 127 F.Supp. 405, 410 (D.D.C.1955) *aff'd* 232 F.2d 334 (D.C. Cir. 1955) (dismissing perjury indictment where inquiry into whether defendant was a "follower of the Communist line" was "subject to varying interpretations");

Prosecutions based on vague questions effectively grant prosecutors the unchecked power to define, after the fact, what information should have been provided in response to facially vague and misleading prompts. In this case, a person of ordinary intellect could reasonably believe, in the context of the DACA process, that "Other Names Used (*include Maiden Name*)" and Other Names Used "(*including maiden name*)" required applicants to provide their maiden or other legal names and that USCIS' exclusion of any reference to "aliases" was intentional, particularly where no regulatory guidance suggested the disclosure of aliases was expected. Due process does not permit the Government to charge offenses based on its desired interpretation of this fundamentally ambiguous application framework. The charges

against Ms. Brinson are therefore unconstitutional applications of Sections 1545(a) and 1015(a).

> a. <u>The DACA and EAD Forms are ambiguous and fail to provide constitutionally sufficient notice that they criminalize the failure to list aliases under the "Other Names Used (*including maiden name*) and "Other Names Used (*include Maiden Name*)" prompts.</u>

Because the DACA policy was not based on any formal statute, rulemaking, or notice and comment process, DACA applicants were forced to rely on the face of the DACA and EAD forms themselves to discern what information was to be provided. The formal USCIS "Instructions" accompanying the forms provided no guidance whatsoever for answering the "Other Names Used" questions. In a section of the application entitled "Information About You," the DACA form prompts applicants to provide their "Full Name" and "Other Names Used (*including maiden name*)." The DACA form does not queue applicants to provide aliases. The EAD form further prompts applicants to simply "*include Maiden Name*" in the field, rather than include any other type of prior assumed names or aliases. Despite ample room to do so, neither form requests the disclosure of "aliases."

Courts, as well as citizens of ordinary intellect, recognize that a drafter's use of the word "include" or "including," (instead of including but not limited to), can "introduce restrictive or definitional terms." *Adams v. Dole*, 927 F.2d 771, 777 (4th Cir. 1991) (Fourth Circuit affirming dismissal based on ambiguous statute's use of the word "including"); *Application of Central Airlines*, 185 P.2d 919, 923 (Okla. 1947) (where a general term is followed by the word "including," (the "participle form of the verb 'include'") the "primary import of the words following is to indicate *restriction*.") (emphasis added).

Under the interpretive canon, "*ejusdem generis*," general words are "limited by words of restricted import immediately following and related to the same subject." *Central Airlines*, 185 P.2d at 923. Applying this precept, the Fourth Circuit, in *Adams v. Dole*, affirmed dismissal of a case where the word "including" rendered a whistleblower statute ambiguous about whether Department of Energy contractors were required to abide by its whistle-blowing provisions. 927 F.2d 771, 775 (4th Cir. 1991) (ambiguous statute provided that "No employer, *including* a Commission licensee, an applicant for a Commission licensee, or a contractor or subcontractor of a Commission licensee or applicant, may discharge an employee" who is a whistleblower.). The *Adams* court stated that the statute's use of the term "including" "leads to an interpretation, under principles of *ejusdem generis*, that the general may be defined by the specific." *Id*; *see e.g. Sparks v. Oxy-Health, LLC*, 135 F. Supp. 3d 961, 981 (E.D.N.C. 2015) (J. Flanagan applying *ejusdem generis* in holding defendant was not a "manufacturer"); *see also In re Clark*, 910 A.2d 1198, 1200 (N.H. 2006) (even using the phrase "including, but not limited to" limits the language "to the types of items therein particularized."); *Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 837 (7th Cir. 2002) ("[I]f all goods of any kind are to be included, why mention only a few?").

The DACA Form's prompt for "Other Names Used (*including maiden name*)" further appears to seek only the disclosure of legal names, rather than aliases, by the fact that it provides space for applicants to list their prior "Family Name (Last Name)" or "Given Name

(First Name)." "Aliases," are commonly understood to relate only to a "name used *other than the given name* of a person."[5]

Neither form indicates a clear duty to disclose aliases. Criminal prosecution "for the violation of an unclear duty itself violates the clear constitutional duty of the government to warn citizens whether particular conduct is legal or illegal." *United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985). Courts have dismissed charges premised on a defendant's alleged violation of an ambiguous statute or regulation. *See e.g. United States v. Apex Oil Co.,* 132 F.3d 1287, 1290-91 (9th Cir. 1997) (dismissing charge based on ambiguous regulations for the discharge of oil by ships); *United States v. D 'Alessio*, 822 F. Supp. 1134, 1145-46 (D.N.J. 1993) (dismissing charges based on ambiguity as to whether defendant, a sheriff, was subject to a rule applicable to certain court employees).

> b.  USCIS instructed applicants *not* to list certain information related to false identities in the DACA process.

USCIS informed the public that certain information about applicants' prior use of false identities was not relevant to DACA or EAD consideration and should not be provided. In response to "frequently asked questions" from the public, USCIS issued updated guidance on September 14, 2012 to dispel the idea that DACA applicants were required to list any false social security numbers they had ever used in response to a question in the EAD Application instructing applicants to "[i]nclude all numbers you have ever used, if any." *See* **Exhibit 3,**

---

[5] "Alias," Law.com Legal Dictionary (available at: https://dictionary.law.com/Default.aspx?selected=2380) (emphasis added); *see also* "Alias," US Legal (available at: https://definitions.uslegal.com/a/alias/); "Alias," The Free Dictionary (available at: https://legal-dictionary.thefreedictionary.com/alias).

DACA Frequently Asked Questions (Sep. 14, 2012) (available at: https://www.uscis.gov/archive/frequently-asked-questions).

USCIS advised the public that, when "filing a Form I-765 as part of a DACA request," applicants should only "list those Social Security numbers that were *officially issued to you* by the Social Security Administration" in response to the prompt to list "*all numbers you have ever used*." *Id* (emphasis added). Legal treatises incorporated this guidance: "Do not list fake Social Security numbers." *See* **Exhibit 8**, 1 Immigration Law Practice Expediter § 20.00, LexisNexus (2019). Legal practitioners fairly concluded that USCIS's instruction not to list false social security numbers in response to a request for "all numbers you have ever used" meant the similarly worded "other names used" also did not require disclosure of false names.

USCIS' "all numbers you have ever used" guidance referred only to legitimately issued numbers legitimately used, and did not seek disclosure of information associated with false identities even if they had been "used" by the applicant. This pronouncement reasonably caused the public to concluded that USCIS's interpretation of "used" in the context of "Other Names Used" similarly related to other legitimately issued names legitimately used. Or, as the parenthetical states, maiden names.

Citing USCIS' stated policy, the nation's largest network of non-profit immigration programs, the Catholic Legal Immigration Network ("CLINIC"), issued guidance to its network of 1,200 attorneys that "we do not recommend that the applicant volunteer [] information" suggesting they "used a fake document when applying for employment." *See* **Exhibit 9**, Catholic Legal Immigration Network Clinic, 20 Common Questions on DACA

(Sept. 21, 2012) (available at: http://library.niwap.org/wp-content/uploads/2015/IMM-Tkit-ClinicDACAFaqs-09.21.12.pdf).

The Government's current position - that applicants were not required to list false social security numbers in response to a question calling for "all numbers you have ever used," but should have guessed they were required to list false names in response to a question calling for "other names used" – defies common sense. The Government's theory would turn "Other Names Used (*include Maiden Name*)" into an impermissible "gotcha" scenario where USCIS uses one interpretation for social security numbers "used" and the completely opposite interpretation for other names "used." *See e.g. United States v. Levin*, 973 F.2d 463 (6th Cir. 1992) (stating "the government may not actively mislead individuals by authoritative assurances that certain activity is legal and thereafter initiate a prosecution for engaging in the sanctioned activity" in affirming dismissal of indictment before trial); *Cox v. Louisiana*, 379 U.S. 559, 571 (1965) (due process barred Defendants' conviction for violation of a statute that prohibited picketing "near a courthouse" after the chief of police had permitted the demonstration).

Where the law is "vague or highly debatable, a defendant –actually or imputedly – lacks the requisite intent to violate it." *Mallas*, 762 F.2d at 363. Because the forms at issue in this case omit any reference to aliases, in favor of a specific prompt for "maiden names" and "given names," the question of whether aliases fall within the scope of the form is at the very least "highly debatable." *Id.* USCIS guidance instructing applicants not to provide information about false identities further bars prosecution. The statutes, as applied, and the forms themselves are unconstitutionally vague and prosecution would violate the Defendant's Fifth Amendment right to due process. All four counts must, therefore, be dismissed.

c. <u>Where the disclosure of aliases is required, USCIS forms specifically call for the disclosure of aliases.  The forms at issue in this case did not call for the disclosure of aliases.</u>

The "Other Names Used" question is not unique to DACA and EAD forms and the origin of the phrase in USCIS parlance confirms it was not intended to elicit aliases.  For example, Form I-9 Application for Employment Eligibility Verification previously required "Maiden Name," and was only changed to "Other Names Used" after 1,229 commenters "asked that DHS revise the term to a non-gender specific word[.]"[6]  USCIS reported that it "replaced the term 'Maiden Name' with 'Other names used, if any (such as Maiden Name)'" in an attempt to add clarity.  *Id.*

In response to public inquiry, USCIS clarified that only "[e]mployees who have used a different *legal name* should complete the other names used field. A common example is a married woman's name." [7] A "legal name" is "[a] person's full name as recognized in law" as "acquired at birth or through a court order."  *See* Black's Law Dictionary, 8th ed. at p. 1048. An alias is not a "legal name."

The "Other Names Used" field in Form I-9 was again changed in 2015 in response to objections from transgender groups insisting the Form I-9 require only "Other Last Names Used" to protect the privacy of those who "change their name when making a gender transition." [8]  Other commenters hoped to retain the "Other Names Used" format because

---

[6] *See* **Exhibit 10**, Appendix to Form I-9, Supporting Statement (Collection Number 1615-0047) (Aug. 28, 2012) (Responses to Comments Received in Response to Notice Published 3/27/2012) (available at: https://www.regulations.gov/document?D=USCIS-2006-0068-0209).

[7] *See* **Exhibit 11**, Appendix to Form I-9, Supporting Statement (collection Number 1615-0047 – Responses to Comments Received in Response to Information Collection Notice Published Aug. 22, 2012) (available at: http://www.reginfo.gov/public/do/DownloadDocument?objectID=37965001) (emphasis added).

[8] *See* **Exhibit 12**, Appendix to Employment Eligibility Verification, Form I-9, Supporting Statement (Collection Number 1615-0047 Responses to Comments Received Following Published Notice Nov. 24, 2015) (available

"some cultures change the first name after marriage."[9]  The Current Form I-9 instructions state that one must "Provide all other last names used, if any (e.g. maiden name). Enter N/A if you have not used other last names. For example, if you legally changed your last name from Smith to Jones, you should enter the name Smith in this field."

USCIS specifically requests the disclosure of aliases when there is a requirement to do so.  The prior or current versions of the following applications, attached hereto as excerpts at **Exhibit 15**, specifically require applicants to disclose "aliases:"

- Form I-485 Application to Register Permanent Residence ("Green Card") requires applicants to disclose all "Other Names You Have Used Since Birth," including "all other names you have ever used, including your family name at birth, other legal names, **nicknames, aliases, and assumed names**."
- Form I-821 Application for Temporary Protected Status requires applicants to disclose "Other Names Used," including "all other names you have used since birth, **including aliases**, maiden name, and nicknames."
- The prior Form N-400 Application for Naturalization instructed applicants that "[i]f you have ever used other names, provide them below."[10]  The current version of Form N-400 instructs applicants to provide "Other Names You have Use Since Birth (include nicknames, **aliases**, and maiden name, if applicable)."
- The Form I-589 Application for Asylum specifically required applicants to answer "What other names have you used? *(include maiden name and* ***aliases)***."[11]
- The Form DS-230 Application for Immigrant Visa and Alien Registration requires applicants to provide "Other Names Used **or Aliases** *(if married woman, give maiden name)*."[12]
- The prior Form I-129F Petition for Alien Fiancé, I-130 Petition for Alien Relative, and I-751 Petition to Remove Conditions on Residence all required applicants to provide "Other Names Used *(including maiden name)*."[13]  The modern Forms I-129F, I-130, and

at: https://www.regulations.gov/document?D=USCIS-2006-0068-0384); **Exhibit 13**, Comment Submitted by National Center for Transgender Equality (Jan. 25, 2016) (available at: https://www.regulations.gov/document?D=USCIS-2006-0068-0363).

[9] *See e.g.* **Exhibit 14**, Comments Submitted by Midsouth Bank (Apr. 26, 2016) (available at: https://www.regulations.gov/document?D=USCIS-2006-0068-0388).

[10] N-400 Application for Naturalization, OMB 1615-0052, Rev. 3/22/2012.

[11] *See* Form I-589, Application for Asylum and for Withholding of Removal, OMB No. 1615-0067, Rev. 12/14/2006.

[12] DS-230 Application for Immigrant Visa and Alien Registration, OMB 1505-0015, Rev. 7-2012.

[13] I-130 Petition for Alien Relative, OMB 1615-0012, Rev. 12/18/2012.

I-751 all now require applicants to provide "all other names you have ever used, **including aliases**, maiden name, and nickname."

The DACA and EAD forms exclude any such reference to aliases. The Fourth Circuit in *Adams* observed that "if DOE contractors were to be included [as subject to the whistleblower statute] one would expect inclusion of" a reference to DOE contractors in the statute. *Adams*, 927 F.2d at 776. The same principle relied on by the *Adams* court, *expression unius est exclusion alterius* (the mention of one amounts to the exclusion of the other), applies here. *Id.*

USCIS has recently altered its requirements for EAD applications to now specifically requests "all other names you have ever used, including aliases, maiden name, and nicknames." The forms in this case included no such language. Even if an applicant had "consulted the law and sought to guide herself accordingly she could have no certainty as to what the law required." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974). A reasonable person would fairly conclude that forms seeking the disclosure of aliases would specifically ask for aliases, while forms merely seeking maiden name would not.

Neither the forms at issue in this case, nor any published guidance, notified applicants that they were expected to disclose nicknames, aliases, or assumed names in response to the "Other Names Used (*include Maiden Name*)" prompts. Sections 1546(a) and 1015(a) are unconstitutionally vague as applied to Ms. Brinson because there was no adequate notice in the statutes, regulations or the forms themselves, suggesting applicants were required to disclose aliases.

**II.  Counts One and Two Must be Dismissed Because the DACA and EAD applications are not "required by the immigration laws" under Section 1546(a).**

Section 1546(a) makes it a crime to (1) "knowingly" state "under oath" or "subscribe[] as true, (2) any "false statement," (3) of a "material fact," (4) in an "application, affidavit, or other document *required by the immigration laws*," or regulations prescribed thereunder.  18 U.S.C. § 1546(a) (emphasis added).  DACA and EAD forms are not "required by the immigration laws" and the Indictment fails to identify any such "immigration laws, or regulations" requiring the filing of a DACA or EAD form.  This is because DACA and EAD forms neither confer immigration status, nor are "required by the immigration laws" and, therefore, cannot form the basis for a violation of Section 1546(a).

In no sense is the decision to request deferred action "*required* by the immigration laws or regulations prescribed thereunder."  18 U.S.C. § 1546(a).  "Require" is defined in Black's Law Dictionary to mean, "To direct, order, demand, instruct, command, claim, compel, request, need, exact."  In analyzing a prior iteration of this very statute, the Supreme Court confirmed in *United States v. Campos-Serrano* that "required" means "required."  404 U.S. 293 (1971).  At that time, Section 1546(a) applied to documents "required for entry into the United States."  The court held that, while counterfeit alien registration cards *could* be used to re-enter the country, their primary purpose was to "effectuate the registration requirement for all resident aliens," and not to facilitate entry.  *Id* at 296, 300.  *Campos-Serrano* held that a "'document required for entry into the United States' cannot be construed to include any document whatsoever that the Immigration and Naturalization Service, from time to time, decides may be presented for re-entry at the border." *Id* at 299.

Furthermore, Section 1546(a), titled "Fraud and misuse of visas, permits, and other documents," applies to forgery, counterfeiting or other fraud in particular documents conferring an immigration status. Unlike visas, permits, or border crossing cards, deferred action is not a type of immigration and grants no legal status to anyone that he or she did not have before.[14] The Government has conceded that deferred action is "not an immigration benefit nor a protection from removal." Government's Memorandum in Support of Defendants' Motion to Dismiss, *Inland Empire v. Nielsen*, 2018 WL 3192163 (C.D. Cal. Feb. 5, 2018); *see also* **Exhibit 16**, USCIS Response to Recommendation re: Deferred Action (Oct. 27, 2011) ("Deferred action is not an immigration benefit, but rather a case-specific… exercise of prosecutorial discretion."). It is a "specific exercise of prosecutorial discretion" "initiated at the discretion of the USCIS or at the request of an individual, rather than an application process." *See* **Exhibit 17**, USCIS Questions and Answers, ALIA-USCIS Headquarters Liaison Meeting at p. 5 (Nov. 1, 2016) (available at: https://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20Engagements/PED_AILA_HQ_LiasionMeeting11012016.pdf). DHS's "exercise of discretion" through DACA confers "no substantive right, immigration status or pathway to citizenship" because "[o]nly the Congress, acting through its legislative authority, can confer these rights."[15] President Obama similarly confirmed that deferred action "is not amnesty…

---

[14] 2012 DACA Policy Memo at Exhibit 1 ("This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.").

[15] *See* Exhibit 1, 2012 DACA Memo at p. 3; *see also* **Exhibit 18**, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, U.S. Citizenship and Immigr. Services ("Deferred action is a use of prosecutorial discretion to defer removal action against an individual for a certain period of time. Deferred action **does not provide lawful status**."); *see also* Homeland Security Investigations, Informants Handbook, HIS HB 12-03, Aug. 2, 2012

is not immunity… is not a path to citizenship," but was a "temporary stopgap measure that lets us focus our resources wisely[.]" *See* Exhibit 2.

The DACA process and other "non-immigration-related" documents, like passports, are not within the ambit of § 1546(a) or its general catchall "other documents" clause. *See United States v. Thomsen*, 830 F.3d 1049, 1061 (9th Cir. 2016) (holding that passports were not covered by the catchall reference to "other document[s]" because they were not immigration documents). The Ninth Circuit in *Thompsen* observed that Congress could have easily included passports in the list if it had intended Section 1546(a) to apply. *Id* at 1062 (applying *ejusdem generis* in holding that "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."). The DACA process is not within the purview of Section 1546(a) and Counts One and Two must be dismissed.

### III. Counts Three and Four Must be Dismissed Because Statements in the DACA and EAD Forms Were Not Made in a "Case Proceeding, or Matter" Relating to "Naturalization, Citizenship, or Registry of Aliens" and, therefore, Cannot Form the Basis of a Violation of 18 U.S.C. § 1015(a).

Section 1015(a) originally appeared in 8 U.S.C. § 746 under Subchapter III "Nationality through Naturalization," and is essentially a false statements charge for naturalization proceedings. Section 1015(a) only applies where the defendant make a "false statement under oath" in a "case, proceeding, or matter relating to… naturalization, citizenship, or registry of aliens[.]" As a matter of law, the Government cannot prevail on Counts Three and Four

(stating that deferred action "is a discretionary measure to postpone the removal of an alien from the United States. Deferred action does not grant the alien any immigration status, and a removal proceeding may be instituted at any time. Deferred action is based exclusively on the exercise of prosecutorial discretion.")

22

because the alleged misrepresentations are (1) unrelated to "naturalization, citizenship, or registry of aliens," all of which are terms of art in immigration law, and (2) unrelated to any case, proceeding, or matter under the immigration laws.

With respect to naturalization and citizenship, USCIS states that "[n]aturalization is the process by which U.S. citizenship is granted to a foreign citizen or national after he or she fulfills the requirements established by Congress in the Immigration and Nationality Act (INA)."[16] In other words, "citizenship" is the result, and "naturalization" is the process. As discussed above, neither the DACA nor the EAD forms relate in any way to citizenship or naturalization, and confer "no substantive right, immigration status or pathway to citizenship."

"Registry of aliens" is also a term of art, albeit an archaic one, with a modern application relating only to the admission (and registry) of permanent residents into the United States who arrived prior to 1972. *See* USCIS Policy Manual Chapter 4 ("USCIS has the discretionary authority to create a record of lawful admission for… foreign nationals who entered the Untied States prior to January 1, 1972. This process is called registry.") (available at: https://www.uscis.gov/policy-manual/volume-7-part-o-chapter-4); CRS Report to Congress, Immigration: Registry as Means of Obtaining Lawful Permanent Residence (Aug. 22, 2001) (available at: http://congressionalresearch.com/RL30578/document.php). According to USCIS, "[r]egistry" allows those select individuals "the ability to apply for a Green Card (permanent residence), even if they are currently in the United States unlawfully."[17]

---

[16] See **Exhibit 19**, USCIS Naturalization Through Citizenship (available at: https://www.uscis.gov/us-citizenship/citizenship-through-naturalization).

[17] **Exhibit 20**, USCIS Green Card Through Registry (available at: https://www.uscis.gov/greencard/through-registry).

The district court in *United States v. Schaier*, considered the definition of the term "registry of aliens" in depth. 175 F. Supp. 838, 839–41 (S.D.N.Y. 1959). Schaier, an employee of Immigration Services, was charged with soliciting additional fees "in a proceeding relating to naturalization, citizenship, and the registry of aliens" in violation of 18 U.S.C. § 1422. *Schaier*, 175 F. Supp. at 839. The defendant moved to dismiss the charge, arguing that the transactions at issue, applications for adjustment and change of non-immigrant status to permanent resident status, were not related to "registry of aliens." *Id.*

In determining the meaning of "registry of aliens," the *Schaier* court turned to Section 328 of the Nationality Act of 1940, which required the Commissioner of Immigration to make a registry of each person arriving in the United States after the effective date of the Act and, under certain conditions, to make a registry of aliens who entered the country before July 1, 1924. *Id.* at 839-40. The Act further provided that aliens who were registered under the Act would be granted permanent residence status. *Id.* at 840; *citing* section 328 of the Nationality Act of 1940, 54 Stat. 1151-1152. Since the defendant's applications related to the admission of aliens for permanent residence under the original Nationality Act, the court concluded that the term "registry of aliens" applied.

Because neither of the forms at issue in this case relate to "naturalization, citizenship, or registry of aliens" under the immigration laws, Counts Three and Four fail as a matter of law. The indictment further fails to identify any pending "case, proceeding, or matter" to which the alleged misrepresentation relates.

**IV.** **Counts One and Two Must be Dismissed Because the Failure to Provide "Other Names Used" Is Not Material Since the Disclosure of Information About Mr. Hernandez's Use of Another Name Would Not Give Rise to Evidence That Fairly Suggests Mr. Hernandez's Ineligibility for Deferred Action or Employment Authorization.**

A defendant cannot be convicted for violation of Section 1546(a) unless he makes a "false statement with respect to a *material fact*" in an "application, affidavit, or other document required by the immigration laws or regulations[.]" Even assuming DACA were "required by the immigration laws," Counts One and Two must still be dismissed because, as a matter of law, Hernandez's failure to list his alias on his DACA and EAD forms was immaterial to his eligibility for deferred action and employment authorization.

The Fourth Circuit holds that when the federal government is the target of a false statement, that false statement is only "material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it is addressed." *United States v. Raza*, 876 F.3d 604, 616 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 2679, 201 L. Ed. 2d 1073 (2018) (*citing Kungys v. United States*, 485 U.S. 759, 769-70, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)). In the immigration context, the Supreme Court held in *Kungys* that "the test of whether [the defendant's] concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service." *Id* at 772, 108 S.Ct. 1537 (emphasis added). The Fourth Circuit has interpreted this materiality test in Justice Brennan's controlling opinion in *Kungys* as requiring "a fair inference that a statutory disqualifying fact actually existed." *U.S. v. Hadeed*, 376 Fed. Appx. 335, 341 (4th Cir. 2010) (*citing Kungys*, 485 U.S. at 783, 108 S.Ct. 1537 (Brennan, J., concurring)) *see also United States v. Puerta*, 982 F.2d 1297, 1304 (9th Cir.1992) (reversing conviction for failure to

disclose aliases on immigration application where the use of aliases did not render defendant "statutorily ineligible for naturalization" and there was no "'fair inference' of ineligibility [for naturalization]").

Accordingly, there is a subjective element of the materiality requirement in immigration offenses, specifically, that the representations would have an actual effect upon the recipient. The Ninth Circuit, in *Puerta*, reversed the conviction of an alien who failed to disclose aliases on his application for permanent residence, holding that no finder of fact could fairly infer that Puerta was actually ineligible for naturalization. 982 F.2d at 1301-02, 1305. The court observed that his use of aliases did not render him "statutorily ineligible for naturalization" and that there was no indication he had a "criminal record under any of his aliases." *Id*; *see also United States v. Raza*, 876 F.3d 604, 617 (4th Cir. 2017) ("[E]ven if the false representation might influence a reasonable person, a fraud conviction was not warranted unless the governmental decisionmaking body considered the false representation to be material."); *United States v. Ismail*, 97 F.3d 50, 60 (4th Cir. 1996) (vacating false statements conviction, including a false name and fictitious social security number provided to the FDIC where the prosecution had "failed to present any evidence bearing on the materiality of the false statements made to the FDIC.").

Counts One and Two fail as a matter of law because the Indictment fails to allege that Hernandez was actually ineligible for DACA or that his failure to list his alias under "Other Names Used" had any bearing on his eligibility. While prior felony "convictions" can bar eligibility under DACA, but prior employment, even under an alias, does not. Before DACA, undocumented persons like Mr. Hernandez, many of whom brought to this country as

toddlers, had to make the grim choice between (1) not working at all and trying to survive without a source of income, (2) working without documentation and risking exploitation, or (3) working with false documentation. DACA never intended to exercise prosecutorial discretion in favor of the first two categories but exclude the third.

As President Obama explained, DACA's goal was to focus enforcement resources "on criminals who endanger our communities rather than students who are earning their education" and to allow "eligible individuals who do not present a risk to national security or public safety" to obtain "relief from deportation proceedings and apply for work authorization."[18] The Supreme Court has recognized the need for "[d]iscretion in the enforcement of immigration law" and observed that "[u]nauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

In exercising this discretion, the DACA policy called for DHS to make a limited inquiry into whether applicants had "been *convicted* of a felony, significant misdemeanor, multiple misdemeanors, or otherwise pose[d] a threat to national security or public safety."[19] While Mr. Hernandez's use of an alias to work may have been prosecutable under some legal theory, there is no allegation that he had been convicted of anything more than a traffic ticket. Without a conviction, his decision to use false documentation to work in the United States was irrelevant to his eligibility for an exercise of prosecutorial discretion under DACA. There is similarly no credible contention that Mr. Hernandez posed a "threat to national security or

---

[18] Exhibit 2, President Barack Obama, Remarks by the President on Immigration.
[19] *See* Exhibit 1, 2012 DACA Memo (emphasis added).

public safety" or that he had a criminal record under his alias that would have rendered him ineligible.

In instituting the DACA policy, USCIS acknowledged that DACA applicants were likely already working in the United States and issued guidance assuring employers of DACA applicants that information about them would not be shared with enforcement authorities. *See* Exhibit 3, DACA Frequently Asked Questions at Q76 (Sep. 14, 2012) (stating that information about an employee's prior unauthorized work "will not be shared with ICE for civil enforcement purposes[.]") (available at: https://www.uscis.gov/archive/frequently-asked-questions); *see also* **Exhibit 21**, Written testimony of DSH Secretary Jeh Johnson for House Committee on the Judiciary (Jul. 14, 2015) ("We want these people to work on, not off, the books, and pay taxes.") (available at: https://www.dhs.gov/news/2015/07/14/written-testimony-dhs-secretary-johnson-house-committee-judiciary-hearing-titled-); **Exhibit 22**, *Immigration Deportation Deferrals Put Employers in a Bind*, New York Times (Sept. 25, 2012) (quoting Department of Homeland Security Official for the proposition that DHS is "not interested in using this as a way to identify one-off cases where some individual may have violated some federal law in an employment relationship.").

Mr. Hernandez's failure to list his alias under "Other Names Used" was not a false statement with respect to a "material fact" and the Indictment raises no "fair inference that a statutory disqualifying fact actually existed." *U.S. v. Hadeed*, 376 Fed. at 341.

## CONCLUSION

WHEREFORE, for the reasons stated above, Ms. Brinson respectfully requests that this Court dismiss all Counts of the indictment for failure to state an offense under Rule 12(b)(3)(b) of the Federal Rules of Criminal Procedure and as unconstitutionally vague under the Due Process Clause of the Fifth Amendment of the United States Constitution.

Respectfully submitted this the 17th day of April, 2019.

MCGUIREWOODS LLP

/s/ Michael F. Easley, Jr.
Michael F. Easley, Jr.
N.C. State Bar No. 41744
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
Telephone: (919) 755-6696
Facsimile: (919) 755-6699
Email: mfeasley@mcguirewoods.com

/s/ Lawrence J. Cameron
Lawrence J. Cameron
N.C. State Bar No. 41922
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
Telephone: (919) 755-6601
Facsimile: (919) 755-6585
Email: lcameron@mcguirewoods.com

*Attorneys for Sarah Jane Brinson*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Sebastian Kielmanovich
Assistant US Attorney
United States Attorney's office
310 New Bern Avenue
Suite 800
Raleigh, NC 27601
Email: sebastian.kielmanovich@usdoj.gov

/s/ Michael F. Easley, Jr.
Michael F. Easley, Jr.
N.C. State Bar No. 41744
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
Telephone: (919) 755-6696
Facsimile: (919) 755-6699
Email: mfeasley@mcguirewoods.com

/s/ Lawrence J. Cameron
Lawrence J. Cameron
N.C. State Bar No. 41922
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
Telephone: (919) 755-6601
Facsimile: (919) 755-6585
Email: lcameron@mcguirewoods.com

*Attorneys for Sarah Jane Brinson*